

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-18-00019-CV

---

IN RE: THE COMMITMENT OF GREGORY A. JONES

---

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 185,786-C

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth
Concurring and Dissenting Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

### Introduction

This is our second time to consider this sexually-violent-predator civil-commitment case. In Appellant Gregory A. Jones's first appeal, we held that the trial court reversibly erred by refusing to give a nonunanimity instruction to the jury, and we remanded the case for a new trial. *See In re Commitment of Jones*, 571 S.W.3d 880, 881 (Tex. App.—Fort Worth 2019), *rev'd*, 602 S.W.3d 908 (Tex. 2020). Though the Texas Supreme Court agreed that the trial court erred, it disagreed with our harm assessment and remanded the case for our consideration of Jones's remaining issues. *Jones*, 602 S.W.3d at 915. It specifically directed our attention to the *Allen* charge given to the jury. *Id.* Having considered the record as a whole, we agree with Jones that the *Allen* charge given by the trial court was impermissibly coercive and constituted reversible error. We therefore reverse the trial court's judgment and remand this case for a new trial.

### Background

### I. The jury's verdict

We adopt the in-depth discussion of facts presented in our 2019 opinion. *See Jones*, 571 S.W.3d at 881–87. We offer the following summary to briefly recap the relevant facts:

Jones has an extensive criminal history involving multiple sex offenses. He has been convicted twice of attempted sexual assault, three times of assault, and once of

2

burglary with intent to commit an assault. Each of those convictions resulted from Jones's entry of a guilty plea. And, yet, Jones denied any guilt for those crimes when examined in preparation for these civil commitment proceedings and when he testified in person at the final trial, at times giving wildly implausible excuses of how events were allegedly misconstrued. *See id.* at 882–84.

According to psychologist Jason Dunham, who evaluated Jones and testified as an expert at trial, Jones was suspected by Arlington Police in 12 additional uncharged assaults, including one in which a man sexually assaulted a woman at knifepoint in an apartment laundry room and then forced her to walk back to her apartment naked. Dunham also testified about a police-report note indicating Jones stated he enjoyed seeing women's surprised looks when he grabbed them inappropriately.

All of Jones's victims were strangers to him. Dunham and the second testifying expert, psychiatrist Sheri Gaines, noted this as a significant risk factor indicating the possibility of a sexual behavioral abnormality, especially when combined with Jones's use of force and weapons, commission of offenses in public places, and complete denial of guilt and lack of remorse. In addition to the nature of his crimes, the experts considered his "hypersexual nature," his refusal to acknowledge a need for sex-offender treatment, and his nonsexual criminal history, which included assaulting his ex-wife. Based upon their reviews of his past crimes (both charged and suspected), their in-person evaluations of him, and actuarial

3

testing,[1] Dunham and Gaines each concluded that Jones suffers from a behavioral abnormality indicating a likelihood of committing sex offenses in the future.

After hearing the testimonies of Dunham, Gaines, and Jones in one day, the jury was released for the evening. The following morning, the trial court read the charge to the jury, the parties made their closing arguments, and the jury began deliberating at 10:49 a.m. At 11:37 a.m., the jury sent a note asking for a definition and a transcript of certain testimony, to which the trial court responded that it could not provide the definition and instructed that to receive a transcript of testimony, the jury must express a disagreement regarding that testimony. At 12:01 p.m., the jury sent a follow-up note regarding the sought-after testimony, but the trial court responded that the court reporter was unable to locate responsive testimony. At 12:27 p.m., the jury sent a third note, this time requesting the actuarial tests administered by Dunham or, in the alternative, a transcript of Dunham's testimony regarding the tests. Again, the trial court responded that the jury must first state there is a disagreement regarding testimony before the trial court could provide a transcript of Dunham's testimony. At 2:07 p.m., the jury sent a fourth note asking, "Can we get

---

[1]*See Jones*, 571 S.W.3d at 886 (describing actuarial testing conducted in this case).

4

something to eat?" The record is silent as to the trial court's response, if any, and whether the jury was fed.[2]

At 4:15 p.m., the jury sent its fifth note, informing the court, "We are unable to come to a unanimous decision. How shall we proceed?" At the State's request and over Jones's objections,[3] the trial court issued the following *Allen* charge at 4:49 p.m.:

> This case has to be settled by some twelve jurors. I regard all of you as honest and intelligent jurors. I do not know of any twelve jurors who can do better than you can. I think you can settle it, and you should settle it, if possible.
>
> I have no desire to attempt to coerce you into a verdict. This is a matter for each of you to determine for yourself, but it is to the interest of society that you should reconsider your differences, and if you can, agree upon a verdict.
>
> You will please return to your room, and if you can reconcile your differences and agree upon a verdict, I hope you will please do so.

The jury immediately requested a break from deliberations, a request the trial court granted while noting the jury had "been in there for six hours." The jury returned to deliberations at 5:20 p.m. and issued its verdict against Jones at 6:35 p.m., almost eight hours after beginning deliberations. The trial court entered judgment

---

[2]The parties disagree on appeal about whether the jury was fed or given a break to eat.

[3]Jones objected to the *Allen* charge as placing undue pressure on the jury to deliberate further after deliberating for six hours, violating jurors' consciences and individual votes by leaving them "feeling compelled to give up their individual vote[s] in order to avoid continued confinement," violating Jones's right to a fair and impartial trial because of its coercive nature, and being coercive by asserting that "they [the jurors] should and could resolve the matter and that the Court hopes that they will" and imploring them to act "in the best interest of society."

5

accordingly, holding Jones to be a sexually violent predator in need of indefinite civil commitment subject to biennial review. *See* Tex. Health & Safety Code Ann. § 841.102.

## II. Our decision and the Supreme Court's reversal

Jones appealed the trial court's decision. One of his five issues asserted that the trial court erroneously refused to give a nonunanimity instruction to the jury—one instructing that it could render a verdict in Jones's favor nonunanimously, by a vote of 10-2. *Jones*, 571 S.W.3d at 889. Construing Section 841.062 of the Health and Safety Code and Rule 292 of the Rules of Civil Procedure, we agreed with Jones. *Id.* at 889–91.

We held that the error was harmful and, in doing so, emphasized the jury's deadlock an hour before issuing its final verdict:

> Although we do not know precisely how the vote among the jurors was split during deliberations,[4] we know that a split existed. The jury issued four notes concerning the substance of the case: three requested portions of the record to review testimony or definitions of certain terms and one, issued four-and-a-half hours after the jury began deliberating, declared that the jury was deadlocked. In response, a modified *Allen* charge was delivered by the trial court, urging the jury to continue deliberating. A unanimous verdict was delivered about an hour and fifteen minutes later. Because we know that a split existed, a 10-2 instruction could have had a significant impact on this situation.

---

[4]As we pointed out in rejecting the State's argument that Jones failed to show error by soliciting evidence of the nature of the jury's split, it is generally considered improperly coercive to poll a potentially deadlocked jury. *Id.* at 891 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 232, 108 S. Ct. 546, 548 (1988); *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. App.—Fort Worth 2005), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006)).

*Id.* at 891.

The Supreme Court disagreed with our harm analysis. After distinguishing the "prevented-from-presenting" and "improper-judgment" prongs of Rule 44.1(a), the Supreme Court held that omitting a nonunanimity instruction was not harmful error because the jury reached a unanimous "yes" verdict: "Because the members of the jury unanimously came to the conclusion that Jones is an SVP, an instruction explaining that a vote of ten of the jurors was sufficient for a verdict declining to find that Jones is an SVP would not have changed the outcome of this case." *Jones*, 602 S.W.3d at 914–15.[5] Rather, the Supreme Court directed our attention to the *Allen*-charge issue, instructing that the proper recourse for a suspicion that the jury did not reach its decision based on "deliberate judgment, sound reflection, and conscientious convictions" is a challenge "on the basis that the verdict was the result of 'chance or lot' or that the court's charge, including an *Allen* charge, was impermissibly coercive."

_____

[5]It rejected Jones's argument that the length of time the jury spent deliberating indicated that the jurors were divided or undecided, explaining,

> That may be so. But because the jury ultimately voted unanimously for a "yes" verdict, we must presume, for the purpose of our harm analysis regarding the erroneous instruction, that the jurors voted the way they did because it was their conscientious conviction. If the jurors had been unable to agree, the trial court could have declared a mistrial. But all twelve jurors ultimately voted "yes," and the question of whether the *Allen* charge was impermissibly coercive, which the court of appeals did not reach and the parties have not briefed in this Court, is a separate issue.

*Id.* at 915 (internal citations omitted).

*Id.* at 914–15 ("[S]uch challenges are independent grounds for reversal and separate from the question of whether the trial court's instructional error was harmful.").

The Supreme Court reversed our judgment and remanded the case for our consideration of Jones's "remaining appellate issues, including the *Allen*-charge issue." *Id.* at 915.

## Discussion

Five issues remain for our consideration, but our holding that the trial court's *Allen* charge resulted in harmful error renders it unnecessary for us to address three of them.[6]  Before we explain our holding regarding the *Allen* charge, we will address Jones's legal sufficiency argument because it would afford the greatest relief if resolved in his favor.  *See* Tex. R. App. P. 47.1.

## I.  The evidence is legally sufficient.

Though we need not address Jones's factual-insufficiency argument because of our resolution of his fifth issue, the unique nature of sufficiency review in sexually-violent-predator civil-commitment cases frames our legal-sufficiency analysis.  As the Texas Supreme Court recently reiterated, we apply a mixed standard when evaluating the legal and factual sufficiency of the evidence supporting the verdict in a sexually-violent-predator civil-commitment proceeding.  *In re Commitment of Stoddard*, No. 19-0561, 2020 WL 7413723, at *11–12 (Tex. Dec. 18, 2020).  In both a legal- and factual-

---

[6]Specifically, we need not address his first two issues, which are evidence-admission complaints, and his fourth issue, a factual-sufficiency complaint.

8

sufficiency review, we "may not ignore 'undisputed facts that do not support the finding' and must otherwise presume the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *Id.* at *7. The difference between the two reviews lies in our treatment of disputed evidence that a reasonable fact finder could not have credited in favor of the finding. *Id.* In a legal-sufficiency review, we are to disregard such disputed and uncredible evidence in determining whether a rational factfinder could find the required sexually-violent-predator elements beyond a reasonable doubt. *Id.* But in a factual-sufficiency review, we are to consider whether that disputed and uncredible evidence, in light of the entire record, is so significant that the factfinder could not have determined beyond a reasonable doubt that the required elements were met. *Id.*[7]

To civilly commit a sex offender, the State must show beyond a reasonable doubt that the person (1) is a repeat sexually violent offender who (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Tex. Health & Safety Code Ann. §§ 841.003, 841.062(a). Jones has never disputed his status as a repeat sexually violent offender and has only contested whether the evidence establishes the existence of a behavioral abnormality; our review will therefore continue to be limited to the second statutorily required element.

---

[7]The court acknowledged that "this distinction 'may be a fine one in some cases.'" *Id.* (quoting *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied)).

9

On remand, Jones attempts to revive the legal-insufficiency arguments that we rejected in his first appeal. His second attempt fares no better than his first. Jones still contends that Dunham's and Gaines's opinions constitute no evidence as a matter of law because of their partial reliance on police reports, which he views as unreliable and untrustworthy. But as we explained in our first opinion, Jones failed to preserve his argument because he did not object to the experts' opinions on the basis of unreliable evidence. *Jones*, 571 S.W.3d at 888–89.

The supreme court has explained that, "when a reliability challenge requires the court to evaluate the . . . foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct [an] analysis" that "necessarily looks beyond what the expert said to evaluate the reliability of the expert's opinion." *Id.* (quoting *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)); *see also Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 412 (Tex. 1998); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997). Jones attempts to analogize the police reports, and the experts' consideration of them, as no better than an opinion that "the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system." *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). He is wrong, not only because his arguments conflate the expert's opinions with the foundational data they examined, but also because the police reports are simply not analogous to such opinions.

10

We do not need any information outside the record before us to know that the Earth is not flat, the moon is not made of green cheese, and our planet is not the center of the solar system. We do not know, based on the record before us, that the police reports are unreliable and untrustworthy—therefore proving that to preserve that argument, Jones had to object to the basis of the experts' opinions in order to preserve his appellate arguments that their opinions constitute no evidence. *See Jones*, 571 S.W.3d at 888–89.

As we explained in our first opinion, the evidence is legally sufficient to support the jury's finding that Jones suffers from a behavioral abnormality that likely predisposes him to committing sexually violent offenses in the future. *Id.* We therefore overrule Jones's third issue.

## II. *Allen* charge

In his fifth issue, Jones argues that the *Allen* charge issued by the trial court was improperly coercive and constituted reversible error. We agree.

Supplemental instructions, commonly known as "dynamite" or *Allen* charges, are permitted as a tool to attempt to "'blast' a jury from deadlock to verdict." *Stevens v. Travelers Ins.,* 563 S.W.2d 223, 226 (Tex. 1978). Their use has not been without controversy over the years. *See id.* at 226–28. The original *Allen* charge, approved by the United States Supreme Court in the eponymous case *Allen v. United States*, instructed the members of the minority in a deadlocked jury to reconsider their

position in light of that of the majority.[8]  164 U.S. 492, 501, 17 S. Ct. 154, 157 (1896).[9]

This approach of targeting those in the minority has been criticized by many, if not

most, jurisdictions, including Texas.  *Stevens*, 563 S.W.2d at 226–27 (collecting cases

and sources).

While appreciating those criticisms, the Texas Supreme Court has instructed

that even a coercive statement "will not invalidate the charge . . . unless it retains its

coercive nature when the charge is then read as a whole and all of the circumstances

surrounding its rendition and effect are considered."  *Id.* at 229.  Thus, we must

evaluate the *Allen* charge by breaking it down and analyzing its parts for coerciveness

and then determining whether any possibly coercive statements retain their coercive

nature when the charge is read as a whole and in context.  *Id.*  ("Words of instruction

in one context and time frame may be coercive but in another may be no more than a

---

[8]Specifically, the trial court instructed as follows (as summarized by the Supreme Court):

> [I]f much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.  If, u[p]on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

164 U.S. at 501, 17 S. Ct. at 157.

[9]To the extent the State argues that the supplemental instruction here was not a true *Allen* charge and therefore subject to a different analysis than that put forth in *Stevens*, we disagree.  Whether labeled an *Allen* charge or a supplemental instruction, the analysis remains the same.  *See Stevens*, 563 S.W.2d at 226–27.

12

permissible effort . . . to bring the deliberations of the jury to a conclusion in a manner fair to the litigants.").

In this case, the *Allen* charge began,

> This case has to be settled by some twelve jurors. I regard all of you as honest and intelligent jurors. I do not know of any twelve jurors who can do better than you can. I think you can settle it, and you should settle it, if possible.

While the opening two sentences of this paragraph may seem "innocent" and a "neutral observation" akin to the *Stevens* trial court's observations that the case was "ably tried" by experienced lawyers, it is made troublesome by the third and fourth sentences read in light of the relationship between judge and jury. That relationship is "complex and contradictory": "The two entities are equal in function; that is, the former is the exclusive judge of the law, while the latter is the exclusive finder of fact. At the same time, a superior-inferior relationship exists between the two." *Stevens*, 563 S.W.2d at 228. As a result, "[a]n instruction that the court will be displeased with a non-productive jury is an implicit threat," and the coercive nature of such an instruction can be further "enhanced" and "solidified" by knowledge of the trial court's power and the realization that "only the judge can allow [the jurors] to end their deliberations and return to their normal affairs." *Id.* at 230. Accordingly, the Supreme Court classified the *Stevens* trial court's statement that "ending [the litigation] will meet with the approval of the Court" as "possibly coercive." *Id.*

Although in the second sentence the trial court praised the jury on its honesty and intelligence, the trial court's third and fourth sentences contain a tacit threat of the impending disappointment if the jury did not reach a verdict, overshadowing the trial court's initial compliment. *See id.* First, the trial court offered its opinion that the jury could reach a verdict. Then it followed up by admonishing that the jury should reach a verdict, indicating its potential for disapproval if the jury should fail to do so. *See Pecos & N.T. Ry. v. Finklea*, 155 S.W. 612, 618 (Tex. App.—Amarillo 1913, no writ) ("The court told them not only they could but 'should,' and therefore they were acquitted of stultification, under their oath."). And it is the trial court's indication of its own personal belief that the jury should reach a verdict that distinguishes its instruction from the civil pattern jury charge's inclusion of the phrase, "In the interest of justice, if you could end this litigation by your verdict, you should do so." Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 1.9 (2018). While the pattern jury charge emphasizes that the jury should—if it could—end the litigation by its verdict "in the interest of justice," the opening paragraph of the instruction in this case played upon the contradictory relationship between judge and jury with an implicit threat of the trial judge's potential disappointment if the jury should fail to reach a verdict.

This paragraph is problematic from another perspective. The conclusion is prefaced by the judge's observation that the jury is "honest and intelligent" and thus able to "settle" the case. The corollary, of course, is that if the jury failed to reach a

14

verdict, perhaps its members were not as honest or intelligent as the judge had presumed them to be.  This, too, carries with it a potentially coercive effect.

Because of these differences, the opening paragraph may be classified as coercive.  *See Stevens*, 563 S.W.2d at 230.

As to the second paragraph, its opening began, "I have no desire to attempt to coerce you into a verdict."  Standing alone and on its face, this sentence seems uncoercive.  But within one phrase of the next statement appears the word "but," which dims the otherwise facially uncoercive nature of the introduction:

> This is a matter for each of you to determine for yourself, but it is to the interest of society that you should reconsider your differences, and if you can, agree upon a verdict.  You will please return to your room, and if you can reconcile your differences and agree upon a verdict, I hope you will please do so.

Again, we find *Stevens* instructive in evaluating the coercive potential of these sentences.  In *Stevens*, the Supreme Court noted its disapproval of instructions that "specifically mention[] the right or duty of the jury to make concessions or reconcile differences."  *Id.* at 230–31 (citing *Gulf, Colo. & Santa Fe Ry. v. Johnson*, 90 S.W. 164, 165 (Tex. 1905); *Reed v. Bates*, 32 S.W.2d 216, 219 (Tex. App.—Beaumont 1930, no writ)).  It determined that the following instruction was not so flawed:

> I don't mean to say by that that any individual person on the jury should yield his own conscience and positive conviction, but I do mean that when you are in the jury room, you should discuss this matter among yourselves carefully and listen to each other, and try, if you can, to reach a conclusion on the issues.  It is the duty of jurors to keep their minds open and free to every reasonable argument that may be presented by fellow jurors that they may arrive at the verdict which

15

justly answers the consciences of the individuals making up the jury. A juryman should not have any pride of opinion, and should avoid hastily forming or expressing an opinion. He should not surrender any conscientious views founded upon the evidence unless convinced by his fellow jurors of his error.

*Id.* at 230.

The pattern jury charge recommended in civil cases adopted this language almost verbatim, making it clear that while jurors should keep an open mind, they should not violate their conscience in yielding to the views of fellow jurors.[10]

But the trial court here did not follow the pattern jury charge, choosing instead to provide the vague advice that "this is a matter for each of you to determine for yourself" and wholly failing to caution the jurors to avoid "doing violence to [their] conscience" or "surrender[ing] any conscientious views founded upon the evidence."

---

[10]The pattern jury charge instructs,

I do not mean to say that any individual juror should yield his or her own conscience and positive conviction, but I do mean that when you are in the jury room, you should discuss this matter carefully, listen to each other, and try, if you can, to reach a conclusion on the questions. It is your duty as a juror to keep your mind open and free to every reasonable argument that may be presented by your fellow jurors so that this jury may arrive at a verdict that justly answers the consciences of the individuals making up this jury. You should not have any pride of opinion and should avoid hastily forming or expressing an opinion. At the same time, you should not surrender any conscientious views founded on the evidence unless convinced of your error by your fellow jurors.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 1.9 (2018).

*See id.* at 230; *Odom v. State*, 682 S.W.2d 445, 447 (Tex. App.—Fort Worth 1984, pet. ref'd). Without this caution, the trial court's asking the jurors to "reconsider" and "reconcile" their differences treads dangerously close to concession instructions, which have long been held impermissibly coercive.[11] *See Stevens*, 563 S.W.2d at 230–31; *Johnson*, 90 S.W. at 342 (holding trial court erred by giving concession instruction due to risk that "an instruction intended for [a frivolous or captious] state of mind might often reach and sway the [sincere and conscientious state of mind]"); *Finklea*, 155 S.W. at 617–18 (holding similarly). The complete absence of the pattern jury charge's juxtaposition between the prohibition against abandoning conscientious views and the value of considering reasonable argument to the contrary tilts the scales of this *Allen* charge. As written, the court's charge appears to elevate consensus over conscience, thereby rendering this *Allen* charge potentially coercive.

And the coercive potential of the trial court's statements is again enhanced by its threat of disappointment when it concluded by reminding the jurors, "I hope you will do so."

Having determined that portions of the charge are possibly coercive when standing alone, we must examine the charge as a whole and the circumstances surrounding its issuance to properly gauge its effect, including any resultant harm. *See*

---

[11]While the Supreme Court presumed that the jurors in this case voted the way they did based on conscientious conviction, the court employed that presumption only in the context of its harm analysis. *Jones*, 602 S.W.3d at 914–15. We do not indulge such a presumption in determining whether the *Allen* charge was impermissibly coercive.

*Stevens*, 563 S.W.2d at 230–31; *see also* Tex. R. App. P. 44.1(a); *Jones*, 602 S.W.3d at 913–14.

We again turn to *Stevens*, the leading Texas case in this area, in which the Supreme Court determined that the *Allen* charge there was not improperly coercive so as to constitute reversible error:

> As to the charge itself, we note that immediately after the judge erroneously indicated that he would disapprove of a failure to reach a verdict, he cautioned the jury not to forsake their personal convictions. This admonition had the effect of diluting the coercive nature of the previous statement and rendering it unobjectionable. This conclusion is buttressed by the fact that the jury did not come to an agreement until it had adjourned over the weekend and then only after deliberation the following Monday for approximately four hours.

*Id.* at 232.

The charge in this case is not similarly diluted or buttressed. As we have noted, the trial court failed to clearly caution against forsaking individual convictions in order to reach a verdict. It expressed its potential disappointment at a possible mistrial, playing upon the "complex and contradictory" nature of its relationship with the jury. In our view, the trial court's attempted disavowal of coercion does not cure those statements.

And, finally, the coercive nature of the *Allen* charge becomes even more apparent and concerning when we consider the trial court's failure to instruct the jury that only ten jurors needed to agree to find that Jones is not a sexually violent predator, particularly in light of the circumstances surrounding the jury's deliberations

18

leading up to the charge and afterward. As we previously held and the Supreme Court agreed, the trial court erred by failing to give a nonunanimity instruction to the jury. *Jones*, 571 S.W.3d at 889–91. Thus, at a very minimum, the *Allen* charge forced a unanimous verdict without properly advising the jury that a nonunanimous verdict was also possible.

This charge was issued at 4:49 p.m., exactly six hours after the jury started deliberating, and possibly without any breaks. Unlike in *Stevens*, where the jury took a weekend-long break after the *Allen* charge, the trial court in this case afforded the jury only 20 minutes immediately after the *Allen* charge's issuance before it returned to deliberating. The trial court made no mention of possible dinner arrangements or the option to break for the evening and return to deliberations the next morning. *Cf. Kimbriel Produce Co. v. Webster*, 185 S.W.2d 198, 201 (Tex. App.—San Antonio 1944, writ ref'd w.o.m.) (holding trial court's suggestion that jury try deliberating for another hour was not impermissibly coercive). And just over an hour after that 20-minute break, at 6:35 p.m., the jury—despite having been so recently deadlocked—issued its verdict finding Jones to be a sexually violent predator in need of indefinite civil commitment. *See Lowenfield*, 484 U.S. at 240, 108 S. Ct. at 552 (noting that a jury's return soon after receiving an *Allen* charge "suggests the possibility of coercion").

Considering the language of the *Allen* charge as a whole and in the context of the circumstances in which it was issued, we hold the instruction to be impermissibly

19

coercive and to constitute harmful error causing the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). We therefore sustain Jones's fifth issue.

## Conclusion

Having sustained Jones's fifth issue, we reverse the trial court's judgment and remand this case for a new trial.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: May 6, 2021