

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00069-CV
_____

IN RE THE COMMITMENT OF TIMOTHY DANIEL RENSHAW

On Appeal from the 402nd District Court
Wood County, Texas
Trial Court No. 2018-452

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Chief Justice Morriss

# OPINION

A Wood County jury unanimously found, beyond a reasonable doubt, that Timothy Daniel Renshaw is a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003. Accordingly, the trial court ordered Renshaw committed to supervision and treatment pursuant to Chapter 841 of the Texas Health and Safety Code, titled "Civil Commitment of Sexually Violent Predators."

On appeal, Renshaw argues that the evidence is not factually sufficient to support the jury's verdict that he is a sexually violent predator, the trial court erred in admitting evidence of unadjudicated sexual offenses over Renshaw's objections, and the trial court erred by failing to submit Renshaw's requested jury instruction. We find that (1) factually sufficient evidence supports the jury's verdict, (2) the trial court did not err in overruling Renshaw's evidentiary objections, and (3) Renshaw was not harmed by the denial of his proposed jury instruction. Therefore, we affirm the trial court's judgment.

*(1)     Factually Sufficient Evidence Supports the Jury's Verdict*

"A person is a sexually violent predator . . . if the person: (1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.003(a). A "behavioral abnormality" is defined as a "congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2).

2

The United States Supreme Court requires proof that the person "has 'serious difficulty in controlling [his] behavior' in order to civilly commit him under any [sexually violent predator] statute." *In re Commitment of Stuteville*, 463 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (first alteration in original) (citing *Kansas v. Crane*, 534 U.S. 407, 413 (2002)). "The inability to control one's behavior 'must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.'" *Id.* (quoting *Crane*, 534 U.S. at 413).

With regard to Chapter 841 of the Texas Health and Safety Code, Texas courts have "held that a 'behavioral abnormality' is considered 'an abnormality which causes serious difficulty in behavior control.'" *Id.* (quoting *In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied)). Thus, "[w]hen a jury finds that a person is a sexually violent predator, that finding entails an implicit determination that the respondent has serious difficulty controlling behavior." *Id.* (citing *Almaguer*, 117 S.W.3d at 505–06). Also, "a jury may infer that a respondent has serious difficulty controlling his current behavior based on his past behavior." *Id.* (citing *In re Commitment of Washington*, No. 09-11-00658-CV, 2013 WL 2732569, at *5–6 (Tex. App.—Beaumont June 13, 2013, pet. denied) (mem. op.)).

Renshaw does not argue that the evidence is legally insufficient. Thus, in reviewing his challenge to the factual sufficiency of the evidence supporting a jury's finding that he is a sexually violent predator, "we weigh all of the evidence to determine 'whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering

3

a new trial.'" *Stuteville*, 463 S.W.3d at 552 (quoting *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied); *see In re Commitment of Dever*, 521 S.W.3d 84, 86 (Tex. App.—Fort Worth 2017, no pet.). "We 'view all of the evidence in a neutral light and ask whether a jury was rationally justified in [its] finding . . . beyond a reasonable doubt.'" *Stuteville*, 463 S.W.3d at 552 (quoting *Day*, 342 S.W.3d at 206). "We will . . . reverse [only] if, after weighing the evidence, we determine that 'the risk of an injustice remains too great to allow the verdict to stand.'" *Id.* (quoting *Day*, 342 S.W.3d at 213). "In conducting our review, we may not substitute our judgment for that of the jury[,] which is the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Id.* (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)).

At trial, Sheri Gaines, a psychiatrist, testified that she had sixteen years' experience doing abnormality evaluations. Gaines reviewed prison records, education records, medical records, records from Renshaw's convictions, sex-offender treatment records, police reports, witness statements, and depositions from Renshaw and his family members. She also interviewed fifty-eight-year-old Renshaw for three hours and evaluated him.

Gaines testified that it is typical for psychiatrists to consider adjudicated and unadjudicated offenses when performing a behavior abnormality evaluation since they are looking for "a pattern of . . . repeated behavior" to determine the risk of reoffending. Renshaw was convicted of two counts of indecency with a child by contact in Texas, thirteen counts of lewd molestation and two counts of forcible sodomy in Oklahoma, and two counts of sexual assault of a child in Colorado. The evidence showed that those offenses occurred in 2000 and 2001 with two young boys.

4

Gaines testified that Renshaw was a leader in his church who occupied a position of confidence and was supposed to serve as a mentor to young boys. Instead, Gaines said, Renshaw groomed his victims by "taking them on the church camp-outs, taking them fishing, buying them ice cream, giving them awards as part of this youth group they were involved in, [and] ma[king] them feel special in that youth group."

According to Gaines, Renshaw said that

the victimization included [but was not limited to] masturbating them; having them masturbate him; performing oral sex on them; having them perform oral sex on him; instructing them to masturbate each other and perform oral sex on each other; and encouraging them to do those kinds of things even when they were not with him.

Renshaw occasionally abused these children in a tent in which his eight-year-old son was sleeping. Although he admitted to the acts, Renshaw said

that the boys wanted -- that the boys consented to it; that he did not realize that eleven, twelve-year-old boys could not consent under the law. So he thought it was okay, because the boys consented to it. . . . [H]e said the boys, kind of, initiated it by asking about sexual behavior.

According to Gaines, Renshaw "blame[d] the victims by saying that the victims asked him to explain sex . . . [and] initiating things." He then said that the boys wanted to "remain in his favor" in the church group. Though Gaines described Renshaw as "a smart man with a way-above-average IQ" of 118, Renshaw claimed that he did not know his sexual acts with eleven- and twelve-year-old victims were illegal. This led Gaines to conclude that Renshaw was not taking responsibility for his actions.

Gaines also testified that several other boys, who she described as similar to the victims abused in 2000 and 2001, had come forward in 1995 with complaints of Renshaw sexually

5

assaulting them in similar manners at church events and campouts. As a result, Renshaw was removed from his position as church youth group leader, prompting him to eventually join another church for the purpose of occupying the same position, which gave him the opportunity to commit the 2000 and 2001 sexual offenses. Gaines talked to Renshaw about the accusations against him from 1995. Gaines testified,

> Mr. Renshaw had an explanation for those accusations, none of which were that he was accepting responsibility for offending on those boys.
>
> For example, one of the explanations was that he was checking the boy for a fever in the inguinal area.
>
> Another explanation was that he was flicking the penis of a little boy who had an erect penis, and telling him that was appropriate.
>
> Another explanation was that the boys were just misbehaving. And that the boys grabbed his hand and rubbed it across his penis.
>
> So all of those were denial minimization rationalization, not accepting responsibility for that behavior.[1]

Gaines said that the 1995 allegations came to light when a church member saw Renshaw touching the crotch of a boy sitting in his lap.

Gaines diagnosed Renshaw with pedophilic disorder of prepubescent children, particularly boys. Accordingly, she testified that Renshaw suffered from a behavioral abnormality that made him likely to engage in predatory acts of sexual violence. She testified that, while deviant sexual behaviors require treatment, Renshaw's disorder affected his emotional and volitional capacity and that he was not able to control his thoughts and actions. Renshaw said that all of his victims,

---

[1]Gaines testified that the inguinal area was "the crease of your leg" and that reports said Renshaw touched the boy between his scrotum and rectum.

6

including the ones in the 1995 allegations, had been his mentees, grew to become his friends, and then became his equals, which, according to Gaines, "gave [Renshaw] permission to perpetrate on them sexually." Gaines testified that Renshaw's pedophilic disorder was a lifetime, chronic condition.

As for the risk factors that supported her opinion that Renshaw was at risk of reoffending, Gaines cited Renshaw's pattern of deviant sexual behavior specifically directed at young boys and his victim-blaming. She also testified that the number of occurrences and "multiple convictions across many counties and across three different states" were also risk factors, as well as the fact that deviant behavior had "been going on for a long time." Gaines added that the persistence and escalation of deviant sexual activity despite detection in 1995, Renshaw's engagement in at least one instance of abuse in an open public place, his choosing of victims outside of his family, and a history of substance abuse were all additional risk factors.

Renshaw also told Gaines that he described one relationship with a boy as "mutual gratification, as having a chemistry together." As a result of the tone Renshaw used and responses made during his interview and his controlling and manipulative behavior, Gaines said Renshaw did not indicate remorse or appreciate the seriousness of the situation. He even remarked that his counselor had told him he had done nothing wrong and that "he just didn't know how to supervise children." According to Gaines, Renshaw had displayed no evidence of change, making him more likely to engage in predatory acts of sexual violence in the future.

Jason Dunham, a forensic psychologist specializing in sex-offender risk assessment, also reviewed the records related to the case and met with Renshaw in October 2018. Dunham

concurred that Renshaw suffered from a behavioral abnormality that made him likely to engage in predatory acts. Dunham testified that Renshaw admitted to looking at child pornography and having pedophilic thoughts since he was a teenager and that Renshaw told the parents of one of the victims that his urges had been present for a long time. According to Dunham, Renshaw admitted to masturbating to thoughts of one of the boys, but minimized his sexual attraction to him by stating, "[I]t was more about affection than anything else." Dunham also testified that Renshaw's pedophilia was a chronic and lifelong condition that would not disappear.

Dunham cited many of the same factors discussed by Gaines in formulating his opinion that Renshaw was at high risk of reoffending, including that Renshaw's "cunning and manipulative behavior toward enticing the young boys . . . require[d] a lot of planning." Aside from the victims of Renshaw's convictions, Dunham said other boys "as young as eight years old" had made "pretty strong allegations" against Renshaw, including an allegation that Renshaw touched a boy's penis while horseplaying in a pool. Dunham put "quite a bit of weight on" the 1995 accusations because they demonstrated a pattern of behavior. While Renshaw at times discussed the 1995 accusations, Dunham testified that Renshaw did not have empathy and initially denied each of the allegations from 1995. Dunham testified that Renshaw's pattern of abuse at two separate churches evinced a "psychopathic characteristic."

The jury heard from Renshaw, who admitted that he had been incarcerated for approximately seventeen years "for engaging young boys in sexual behavior." Renshaw said that he was convicted of nineteen offenses and described the abusive acts in great detail. Yet, he never acknowledged that he was sexually attracted to boys. His explanation follows:

8

> I was not attracted to their age or maturity level. I was attracted to the opportunity to engage in behavior with young boys that I perceived, wrongly, that -- that they -- at the time, I believed that they were interested in that same type of behavior with me. And I couldn't have been more wrong.

Even at trial, Renshaw admitted he felt a chemistry with one of the young boys he assaulted in 2000 and masturbated to thoughts of him. He added that he "never gave any consideration [of] harm" to the boy.

Renshaw discussed his sexual contact with one of the children who came forward in 1995. As for the 1995 accusations, Renshaw said they "did not alter [his] belief system." Renshaw claimed that he was not sexually attracted to young boys because, "[w]hen [his] behavior [in 2000 and 2001] came into the light, [his] attitude towards [his] victims completely changed. [He] no longer saw them as willing participants or consenting individuals." Renshaw testified that he was sexually abused by a Cub Scout member when he was five. Yet, he also testified that he was "stunned" when he learned that the young boys were legally unable to consent to sexual activity with him.

Although he said on January 29, 2019, that he did not realize that his conduct was wrong, he told the jury that he had realized it was wrong by the time of his April 23 trial. Renshaw testified that he knew how to seek "appropriate" sexual partners because he was married at the time of the sexual assaults, had engaged in one-night stands, and had previously hired a prostitute. Renshaw said that he saw a counselor in 1995 who determined that he was not a pedophile, and Renshaw did not consider himself a pedophile.

Dunham agreed that Renshaw was evaluated after the 1995 allegations, with the counselor concluding that he did not seem to have the characteristics of a pedophile. Yet, Dunham said that

9

that counselor's opinion was based solely on Renshaw's self-reporting of the incidents and was clearly wrong given his nineteen later convictions. According to Dunham, the 1995 evaluation demonstrated Renshaw's ability to manipulate and persuade.

Renshaw performed well on certain standardized evaluations. He scored a one on the STATIC-99R, correlating with a low risk of recidivism. He scored seventeen out of forty on the Psychopathy Checklist Revised (PCL-R), and Dunham reported that the portion of the PCL-R linked to recidivism showed a lower risk by Renshaw. Dunham also reviewed a note from a treatment provider saying that Renshaw had genuine remorse. Yet, Dunham testified that Renshaw's STATIC-99 score underestimated his risk of reoffending and that, in Dunham's opinion, Renshaw had a high risk of reoffending given the nature and pattern of his offenses. Gaines concurred that Renshaw's scores were "an underrepresentation, because of these individual things about Mr. Renshaw that the actuarials couldn't compute."

Neither Gaines nor Dunham found Renshaw to be a psychopath or to have antisocial personality disorder, both factors for increased recidivism. Dunham testified that he did not have enough information to determine whether Renshaw had narcissistic personality disorder. Renshaw had a history of stable employment and a "pretty good pattern of prison behavior." Although Renshaw had not used drugs in thirty-five years, both Gaines and Dunham diagnosed him with substance abuse disorder. Renshaw testified that he was arrested and was placed on deferred adjudication community supervision for possessing thirty Quaaludes and "a half pound or a pound of marijuana" after getting "ridiculously drunk and [doing] some Quaaludes." He continued to smoke marihuana during the first four years of his community supervision period but was retained

on community supervision by officials' mercy after promising reform. He made similar promises of reform to the jury in this case.

Renshaw testified that he had completed numerous courses while in prison, including several programs offered by the Texas Association of X-Offenders, Promise Keepers Training, a Cognitive Intervention Program, a Re-Directions Class, Winning at Work and Home, and the Quest for Authentic Manhood. He also stated that he had graduated the Faith Based Dorm, but none of those curriculums dealt with deviant sexual behavior.

Renshaw had also received diplomas in Pastoral Ministries and Biblical and Ministry Studies, along with Seminary Extension Diplomas for Contemporary Christian Preaching, Public Worship, Formation for Ministry, Introduction to Christian Ethics, Pastoral Ministry, and Pastoral Care, among others. He had even authored a few books on the topic of Christianity. Gaines and Dunham expressed concern over Renshaw's efforts given that his participation in church provided him with the opportunity to sexually prey on children, and according to Gaines, Renshaw's writings could be used to "mislead a potential audience," if published.

By the time of trial, Renshaw was in a mandatory sex-offender treatment program. Gaines testified that Renshaw's continued participation in the program was insufficient given his diagnosis and victim-blaming and his admissions that he had not started group therapy and had only completed four months out of the nine-month program. Renshaw also admitted that he was hostile towards a section of the sex-offender treatment program due to his religious beliefs.

Renshaw believed he was progressing. He understood that "the risk of offending [wa]s always present," and he stated that he had accepted that risk. He admitted, "There are a number

11

of problems that could arise from me being around children. And I won't allow that to happen." He agreed that he would need a chaperone who was fully informed of his specific offenses, but that no one had indicated they would serve in such capacity.

He planned to live with his mother and stepfather, Henry Howarton, but said that they did not know the details of his actions. Howarton testified that he would help Renshaw find work if he came to live with them, but confirmed that he did not know much about Renshaw's offenses. Renshaw said that he would have to deal with his actions for the rest of his life to make sure "there will never be any more victims."

Gaines testified that Renshaw had people in a support system, but that they could not keep him from reoffending. When considering all the factors and circumstances of Renshaw's history as a sexual predator of young children and his responses to interview questions, Gaines and Dunham informed the jury that Renshaw was at high risk of reoffending. As a result, the jury concluded that Renshaw was a sexually violent predator.

Renshaw's argument that the evidence is factually insufficient relies heavily on a recent split decision penned by a three-judge panel of the Fort Worth Court of Appeals, a decision that is now pending on a petition in the Texas Supreme Court regarding whether it will consider the case. *See In re Commitment of Stoddard*, No. 02-17-00364-CV, 2019 WL 2292981 (Tex. App.—Fort Worth May 30, 2019, pet. filed) (mem. op. on reh'g).[2] Stoddard pled guilty to two counts of aggravated sexual assault of a child and one count of possession of child pornography. *Id.* at *1,

---

[2]Stoddard was accused of performing oral sex on a child, receiving oral sex from her ten or eleven times, attempting anal sex with her, touching her genitals, causing her to touch his genitals, and forcing her to perform oral sex on another male child. *Stoddard*, 2019 WL 2292981, at *1. Stoddard maintained that he only caused the child to perform oral sex on him twice and, in spite of his plea, did not sexually assault the male child. *Id.* at *13.

12

*13. At Stoddard's commitment trial, an expert diagnosed Stoddard with pedophilic disorder and testified that he suffered from a behavioral abnormality that made him likely to engage in predatory acts of sexual violence. *Id.* at *5. The expert's findings were based on Stoddard's sexual deviancy as shown by his convictions, minimalization of guilt, participation in sex-offender treatment, personality traits, history of substance abuse, nonsexual offense history, prison disciplinary history, employment and relationship history, and protective factors. *Id.* Stoddard was not diagnosed with antisocial disorder or psychopathy, although he exhibited some of those traits and scored a four on the STATIC-99 and a twenty on the PCL-R. *Id.* at *7–8. As in this case, those standardized evaluations indicated a low risk of recidivism. *Id.* at *8.

The Fort Worth Court of Appeals reversed the jury's verdict finding Stoddard to be a sexually violent predator. *Id.* at *9. In doing so, the Fort Worth court noted, "Chapter 841 applies only to a member of a small group of extremely dangerous sex offenders" and, without limitation to "narrow circumstances," could not pass constitutional muster. *Id.* at *12 (citing *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997)). It wrote:

> [T]o interpret the statute without regard to Section 841.001, as urged by the State, risks ripping Chapter 841 from its constitutional foundation, thus opening the door to civil commitments of sex offenders based solely on their predicate sex offenses. Such a result would present a high risk of injustice by allowing a fact-finder to give the State a second bite at the apple after a sex offender has already served his sentence to the extent required by law. And the bite is a tempting one, given that the nature of the underlying offense will necessarily include deplorable acts involving sexually predatory and assaultive behavior. But while perhaps an understandable sentiment, the notion that all sex offenders should be indefinitely confined is not compatible with our system of due process and justice. Permitting the State to extend a sex offender's confinement indefinitely based on not much more than the facts related to the underlying crime for which he was convicted allows a fact-finder to succumb to the temptation to lock up sex offenders and throw away the key. It would allow juries to do in civil cases that which cannot be done

in criminal cases—punish twice for the same conduct. And given the state of the evidence, we believe the risk of such bias in the verdict is present here.

*Id.*

The Fort Worth court reasoned that the "'soft' science . . . evidence . . . focused almost entirely on Stoddard's commission of the 2003 offenses—offenses for which he ha[d] already served his sentence and ha[d] become eligible for parole under the terms of the law." *Id.* at *12. Although it described Stoddard's crimes as "indisputably reprehensible," the Fort Worth court found that they "pale[d] in comparison to those of sexually violent predators whose commitments ha[d] been upheld." *Id.* The Fort Worth court found, "In most cases . . . surveyed, the civilly committed sexual violent predator had a history of multiple sexual offenses over an extended period of time." *Id.* It concluded that Stoddard's three convictions, history of nonsexual prior offenses, standardized evaluation scoring, substance abuse diagnosis, and evidence of risk factors was simply not enough. *Id.* at *13–15; *but see In re Joiner*, No. 05-18-01001-CV, 2019 WL 4126602, at *9 (Tex. App.—Dallas Aug. 30, 2019, pet. filed) (mem. op.) (finding two violent sexual offenses, existence of sexual deviance and antisocial personality disorder, and failure to complete sex-offender treatment factually sufficient to support finding that person was sexually violent predator); *In re Commitment of Mendoza*, No. 05-18-01202-CV, 2019 WL 5205710, at *8 (Tex. App.—Dallas Oct. 16, 2019, pet. filed) (mem. op.).

We first note that "a person's psychopathy is not a requisite finding that must be made in support of his commitment as a sexually violent predator." *In re Commitment of Hebert*, 578 S.W.3d 154, 159 (Tex. App.—Tyler 2019, no pet.). Moreover, civil commitments have been upheld even when the person scored a zero on the STATIC-99R. *In re Commitment of Ramshur*,

14

No. 09-17-00286-CV, 2018 WL 6367529, at *2 (Tex. App.—Beaumont Dec. 6, 2018, no pet.) (mem. op.). Although Renshaw's standardized evaluation scoring was low, he was not diagnosed with antisocial personality disorder or psychopathy, and his substance-abuse diagnosis had little value to the ultimate issues. This case is far removed from *Stoddard*. Stoddard's offenses arose from the same time period, and there was no evidence of any other deviant behavior before those offenses. Here, the evidence showed Renshaw had a history of pedophilic behavior.

Dunham testified that Renshaw admitted to looking at child pornography and having pedophilic thoughts since he was a teenager. Dunham and Gaines testified that his pedophilic disorder regarding prepubescent children, particularly boys, was and would be a lifelong behavioral abnormality. The evidence showed that Renshaw positioned himself to become a youth group church leader, and allegations from several boys in 1995 showed that Renshaw could not control his pedophilic impulses. Renshaw initially denied and later admitted to some of the allegations in 1995, but attempted to provide explanations that the jury was free to reject, such as touching a boy's genital area to check for fever and flicking a boy's penis to signal his belief that an erection was appropriate. After several of those allegations caused Renshaw to lose his position with the youth group at one church, he moved to another church and became its youth minister. Dunham testified that Renshaw's pattern of abuse at two separate churches evidenced a "psychopathic characteristic."

The evidence showed that, even though his deviant behavior had been detected in 1995, Renshaw still could not control his pedophilic impulses. He groomed two more victims and sexually assaulted them many times in several states for approximately a two-year period. As a

15

result, he was convicted of nineteen sexual crimes against those children. He believed he had chemistry with one of the children and told the parents that his urges had been present for a long time. He told Dunham that he masturbated to thoughts of one of the boys, but minimized his sexual attraction to him by stating, "[I]t was more about affection than anything else."

As the fact-finder, the jury was free to reject Renshaw's outrageous claim that he was "stunned" to learn that young boys could not consent to sexual activity with adults. The jury also heard Renshaw admit that there were numerous "problems that could arise from [him] being around children" and that he needed a chaperone, although no one had agreed to serve in that capacity. He had not yet attended any group sessions in his sex-offender treatment program.

Renshaw had described his sex acts with children as "mutual gratification," which Gaines testified showed that he did not appreciate the seriousness of his crimes. Both Gaines and Dunham said that Renshaw did not have empathy or remorse, engaged in minimalization and victim-blaming, and was likely to engage in predatory acts as a result of his pedophilia.

Weighing all of the evidence in a neutral light and applying the relevant factual sufficiency standard, we conclude that a rational jury could have found beyond a reasonable doubt that Renshaw was a repeat sexually violent offender who suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence because he had serious difficulty in controlling his behavior. Accordingly, we do not find that the jury's verdict reflected a risk of injustice that would compel ordering a new trial. Because we find that factually sufficient evidence supports the jury's verdict that Renshaw is a sexually violent predator, we overrule this point of error.

16

*(2)*     *The Trial Court Did Not Err in Overruling Renshaw's Evidentiary Objections*

At trial, Gaines and Dunham testified about Renshaw's unadjudicated prior offenses.  "In a civil proceeding, '[e]videntiary rulings are committed to the trial court's sound discretion.'"  *In re Commitment of Price*, No. 06-16-00077-CV, 2017 WL 2299141, at *1 (Tex. App.—Texarkana May 26, 2017, pet. denied) (mem. op.) (alteration in original) (quoting *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam)).  "A trial court abuses [its] discretion when it acts without regard for guiding rules or principles."  *Id.* (alteration in original) (quoting *17 U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012)).  "We will not reverse unless the error probably caused the rendition of an improper judgment."  *Stuteville*, 463 S.W.3d at 554 (citing TEX. R. APP. P. 44.1(a)(1)).

An expert in a Chapter 841 "civil commitment proceeding may disclose details regarding the underlying facts or data that the expert relied on in arriving at her opinion."  *Id.* at 554–55 (citing *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied); TEX. R. EVID. 705(a) ("expert may . . . disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data")).  "[H]aving an expert explain the facts he considered, including past sexual offenses, and how those facts influenced his evaluation, assists the jury in weighing the expert's opinion on the ultimate issue" of whether a person is a sexually violent predator.  *Id.* at 555 (citing *In re Commitment of Young*, 410 S.W.3d 542, 557 (Tex. App.—Beaumont 2013, no pet.)).

Despite Rule 705, Renshaw argues that the trial court erred in overruling his Rule 403 objection to evidence of the unadjudicated offenses.  As relevant here, Rule 403 of the Texas Rules

of Evidence "also provides that relevant evidence may be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Id.* (quoting TEX. R. EVID. 403). "Factors considered when applying the Rule 403 balancing test 'include the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence.'" *Id.* (quoting *Anderson*, 392 S.W.3d at 882). "Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one." *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied).

In civil commitment cases, evidence of uncharged sexual offenses, when it is used by experts, is "highly probative and helpful to the jury in explaining the basis of [the expert's] opinion that [a person] has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence." *Stuteville*, 463 S.W.3d at 556. For this reason, experts in civil commitments may disclose underlying facts that the expert relied on "including the details of adjudicated and unadjudicated sexual assaults." *In re Commitment of Mark Edward Langford*, No. 01-18-01050-CV, 2019 WL 6905022, at *3 (Tex. App.—Houston [1st Dist.] Dec. 19, 2019, no pet. h.) (mem. op.). Therefore, the probative value of the unadjudicated offenses weighs greatly in favor of their admission.[3]

---

[3]In the context of his objection under Rule 403, Renshaw argued that "the probative value of that is only going to an improper character process." The trial court responded, "I understand your objection, your concern counsel. But, I do feel like the underlying facts are certainly very probative and necessary for the jury to use to formulate their opinions during deliberations." On appeal, Renshaw raises a separate point that the trial court erred in admitting the evidence under Rule 404. The appellee responds by arguing that the Rule 404 issue was not preserved. We agree. Because Renshaw's argument at trial was made under Rule 403, it does not appear from the record that the trial court understood Renshaw to be making a separate objection under Rule 404. Therefore, we find the issue unpreserved. In any event, Rule 404(a) would exclude evidence only if the evidence is offered "to prove that on a particular occasion

18

As for the potential to impress the jury in some irrational way, the trial court provided the contemporaneous limiting instruction requested by Renshaw at trial.[4] While the details of the 1995 allegations relayed by Gaines and Dunham, some of which were also discussed in part by Renshaw, had the potential to impress the jury, the 1995 allegations were not nearly as sordid as the details of Renshaw's convictions. Thus, the trial court could find that the unadjudicated offenses would not impress the jury in an irrational manner.

The third factor in the balancing test, the time needed to develop the evidence, also weighs in favor of admission. Neither expert spent much time discussing the factual details of the unadjudicated offenses.

The need to present evidence of the unadjudicated offenses to show the basis of the expert's opinion that Renshaw suffered from a behavioral abnormality was also great. Without these offenses, the jury would not have heard of Renshaw's pattern of sexual abuse of children in his

___

the person acted in accordance with the character or trait." *In re Commitment of Haines*, No. 09-15-00526-CV, 2016 WL 3356571, at *4 (Tex. App.—Beaumont June 16, 2016, no pet.) (mem. op.) (quoting TEX. R. EVID. 404(a)). The evidence of unadjudicated offenses was not introduced to "prove that he acted in conformity therewith on a particular occasion, but rather to prove that he currently suffers from a behavioral abnormality." *Id.*

[4]The court's instruction stated:

> Respondent has requested a limiting instruction about the disclosure of hearsay facts or data underlying the expert's opinion. Hearsay is a statement that the declarant does not make while testifying at the current trial and a party offers into evidence to prove the truth of the matter asserted in the statement.
> Generally, hearsay information is not admissible under Texas Rules of Evidence 801(D). Certain hearsay information contained in records reviewed by the expert may be admitted before you through expert testimony. Such hearsay information is admitted only for the purposes of showing the basis of the expert's opinion and to allow you to assess the weight and credibility of the expert's opinion.
> However, this hearsay information cannot be considered as evidence to prove the truth of the matter asserted under Texas Rules of Evidence 705(d). You may not consider this hearsay information for any other purpose, including whether the facts alleged in the records are true.

youth groups. The lack of this evidence could have risked positioning this case in line with the *Stoddard* case. In other words, without the unadjudicated-offense evidence, the jury would not be basing its verdict on the full picture of Renshaw's sexual deviancy, and the evidence may have been factually insufficient to find that Renshaw was a sexually violent predator. Thus, this factor also weighs heavily in favor of admission.

We cannot say that the trial court abused its discretion in refusing to find that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Based on this record, the trial court could have reasonably concluded that the facts and details related to Renshaw's unadjudicated offenses "would be helpful to the jury in weighing his testimony and [the experts'] testimony, and in explaining the basis for [the experts'] opinion[s] that [Renshaw] suffers from a behavioral abnormality." *Stuteville*, 463 S.W.3d at 556. "Given the purpose for admitting this evidence and the trial court's limiting instructions, we hold that the trial court did not abuse its discretion by admitting evidence of uncharged offenses." *Id.*

We overrule this point of error.

*(3)     Renshaw Was Not Harmed by the Denial of His Proposed Jury Instruction*

"A trial court's decision to refuse a particular instruction in its charge is reviewed for an abuse of discretion." *Id.* at 554 (citing *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012)). "A trial court may refuse to give a requested instruction or definition that is not necessary to enable the jury to render a verdict, even if the instruction or definition is a correct statement of the law." *Id.* (citing *In re Commitment of Taylor*, No. 09-10-00231-CV, 2010 WL 4913948, at *1–3 (Tex. App.—Beaumont Dec. 2, 2010, no pet.) (mem. op.)).

20

"The . . . jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator," and its verdict on that issue must be unanimous. TEX. HEALTH & SAFETY CODE ANN. § 841.062(a), (b). "This statute unambiguously requires that the jury must be unanimous in its determination that a person is a sexually violent predator. But by its plain words, the statute clearly does not require that the jury be unanimous in a determination that a person is not a sexually violent predator." *In re Commitment of Jones*, 571 S.W.3d 880, 890 (Tex. App.—Fort Worth 2019, pet. filed). Thus, Renshaw asked the trial court to instruct the jury that, "[i]f ten (10) or eleven (11) jurors find that the State has not met its burden of proof on the question, then those ten (10) or eleven (11) jurors should sign the certificate indicating that his or her answer to the question is 'no.'" The trial court denied the instruction.

In *Jones*, the Fort Worth Court of Appeals held "that the trial court erred by declining to instruct the jury that it may render a 'no' finding with 10 jurors' concurrence." *Id.* at 891; *but see Stuteville*, 463 S.W.3d at 554 (finding no error in the failure to submit a proposed instruction that was legally correct because it was "not statutory law and was not necessary to enable the jury to render a verdict in th[e] case"). In finding the error harmful in *Jones*, the Fort Worth Court of Appeals wrote,

> Although we do not know precisely how the vote among the jurors was split during deliberations, we know that a split existed. The jury issued four notes concerning the substance of the case: three requested portions of the record to review testimony or definitions of certain terms and one, issued four-and-a-half hours after the jury began deliberating, declared that the jury was deadlocked. In response, a modified *Allen* charge was delivered by the trial court, urging the jury to continue deliberating. A unanimous verdict was delivered about an hour and fifteen minutes later. Because we know that a split existed, a 10-2 instruction could have had a significant impact on this situation.

21

*Jones*, 571 S.W.3d at 891.

Here, assuming without deciding that the trial court's denial of the proposed instruction was erroneous, it was harmless under Rule 44.1 of the Texas Rules of Appellate Procedure. The trial court's charge instructed the jury that it was required to have a unanimous verdict, we presume that the jury followed the trial court's instructions, and the jury certified on the record that its verdict was unanimous. Unlike in *Jones*, there was no evidence of a split decision. Instead, the jury's only correspondence with the trial court said that it had reached a unanimous verdict.[5]

We overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     January 8, 2020
Date Decided:       February 5, 2020

---

[5]Renshaw has failed to brief the issue of harm, and we find that he is unable to demonstrate any harm from the trial court's denial of his proposed instruction.

22