

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00033-CV

———————————————

IN RE: THE COMMITMENT OF JUSTIN SHELTON

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. 18-1648-16

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion on Rehearing by Justice Womack

## MEMORANDUM OPINION ON REHEARING

Appellant Justin Shelton filed a Motion for Rehearing of our original opinion that issued on February 13, 2020. We deny the motion, withdraw our prior opinion and judgment, and substitute the following.

### I. INTRODUCTION

In four issues, Shelton appeals the trial court's order that he be committed as a sexually violent predator. Specifically, Shelton argues (1) that the State committed fundamental error by allowing him to enter into a plea agreement for a low-level sentence for the purpose of commencing this commitment proceeding to detain him indefinitely; (2) that the trial court prevented him from fully presenting defensive theories when it sustained the State's objection to his closing argument; (3) that the trial court erred by granting a partial directed verdict; and (4) that the trial court erred by refusing to include his requested charge that the jury could acquit him on less than a unanimous jury. We affirm.

### II. BACKGROUND

Shelton has been convicted of six sex offenses. In 2004, when he was twenty, Shelton was convicted of two counts of sexual assault against a fifteen-year-old girl. In 2015, when he was thirty, Shelton was convicted of two more sexual assaults against a fourteen-year-old girl. While he was serving his sentence for the second set of convictions, the State petitioned to have Shelton declared a sexually violent predator under Chapter 841 of the Health and Safety Code. *See* Tex. Health & Safety Code Ann.

§ 841.003. After the filing of the State's petition but prior to a trial being held, Shelton's biological daughter made an outcry that Shelton had sexually assaulted her when she was between the ages of nine and eleven. The State withdrew its commitment petition and entered into a plea agreement with Shelton wherein he pleaded guilty to indecency with a child by contact (touching his daughter's breast) and aggravated sexual assault (digitally penetrating his daughter's sexual organ). Shelton's plea was that he serve five years' confinement. Shelton was scheduled to be released from incarceration on November 15, 2019. After Shelton entered his plea agreement with the State, the State re-filed these commitment proceedings. A jury trial was held on November 6, 2018.

## A. Dr. Sheri Gaines Testified

At trial, psychiatrist Dr. Sheri Gaines testified that, among other areas of psychiatry, she had practiced forensic psychiatry for twenty-eight years and that she had evaluated approximately 135 individuals for civil-commitment cases. As part of her evaluation of Shelton for this case, she met with Shelton for roughly three-and-a-half hours, and she reviewed numerous documents related to his criminal and psychological histories. One of the documents she reviewed was a report from a psychologist who evaluated Shelton when the State originally petitioned for Shelton's commitment in 2015. Gaines testified that the psychologist who wrote the report concluded that Shelton has a behavioral abnormality; Gaines agreed. Gaines explained that Shelton displayed two major risk factors: sexual deviance and antisocial behavior. Gaines said that she diagnosed Shelton sexually deviant because he had been convicted of numerous

sexual offenses, once against a prepubescent child and others against postpubescent children. Gaines identified these acts as sexually deviant because they are illegal, and prepubescent and postpubescent children do not possess the brain maturity to be able to consent to sex.

Gaines further averred that the fact that Shelton quickly violated his community supervision[1] terms after his first conviction indicated an inability by Shelton to follow social rules, typical of antisocial behavior. After Shelton's community supervision was revoked, he went to prison where he attended an eighteen-month sexual-offender program. Gaines said that the records indicated that although he participated in the program, his treatment provider expressed concern that Shelton was not showing evidence of internalizing the things he was learning.

Gaines said that after Shelton was released from prison, he failed to continue sex-offender treatment despite recommendations to do so. Instead, Shelton committed another two sexual assault offenses, this time with a fourteen-year-old girl. Gaines said that in addition to him having committed the two sexual assaults, this episode by Shelton was disturbing because it appeared that Shelton and the victim had exchanged sex-based text messages as well as text messages talking about killing the girl's mother in order for her and Shelton to be together. Gaines also said that Shelton had been

---

[1]Shelton's violations of community supervision included failure to report as a sex offender, drug use, and being in the presence of a child under the age of eighteen.

4

inconsistent, and at times outright disingenuous, throughout the years about what actually transpired between him and the girl, at times claiming that the sexual acts were consensual. According to Gaines, this behavior demonstrated both antisocial behavior and sexual deviancy.

Gaines explained that after Shelton's offenses against the fifteen year old and the fourteen year old, Shelton's sexually deviant behavior broadened in range in that he began to sexually abuse his own prepubescent daughter when she was between the ages of nine and eleven.[2] Another risk factor that Gaines described Shelton as displaying was that he would groom his victims by providing them with drugs and acting as a father figure to them. She also said that Shelton sees himself as the victim of circumstances rather than someone who did something wrong and that he believed his sexual acts with the two postpubescent girls had a positive impact on them and helped straighten out their lives.

Gaines stated that with regard to Shelton's daughter, Shelton maintained that there were innocent reasons for the actions that led to him pleading guilty to indecency with a child and aggravated sexual assault of a child. According to Gaines, Shelton sexualized his daughter and expressed that he liked the way his daughter looks, and he used very crude words to describe her genitalia. At one point in sex-offender treatment,

---

[2]Gaines also testified that Shelton's ex-girlfriend's daughter had reported allegations of abuse a few days before trial that allegedly occurred when the girl was thirteen years old.

5

Shelton quoted a passage of the Bible that he said made it "okay to have sex with [one's own] daughter in order to keep [one's] bloodline going." Gaines also said that Shelton displayed manipulative and antisocial behavior while incarcerated—for instance, he would send letters to his daughter stating that if she told anyone what had transpired between them, he would kill himself.

Gaines said that Shelton's continued recidivism indicated a "huge risk factor" in her diagnoses because it demonstrated that Shelton suffered from "persistence after punishment" behavior and that this indicated that Shelton was at a future risk to offend again. Gaines said that her sexual-deviant diagnosis of Shelton is that he experiences "pedophilic disorder." Gaines testified that this is a lifelong disorder and that Shelton was at high risk to offend again. She also said that in making this diagnosis she took into account that Shelton had sexually assaulted a child between the ages of nine and eleven as well as other victims who were thirteen, fourteen, and fifteen. Gaines said that it was not only the offenses against his daughter that led to her diagnosis but rather the "whole picture" of Shelton that she had developed from meeting with him and examining his history.

Pertaining more to her antisocial-personality-disorder diagnosis, Gaines said that unlike most individuals that she had assessed, there was a large amount of evidence from Shelton's pubescent past that indicated he had suffered from the disorder for some time. Specifically, Gaines said that Shelton had run away from home multiple times as a teen, been suspended from school, and spent time in juvenile detention twice

6

when he was thirteen for two separate burglaries of habitations. Gaines averred that Shelton's antisocial behavior continued into adulthood and that Shelton had a history of drug use, domestic violence, and criminal mischief, including slashing tires, harassment, and retaliation. Gaines also said that Shelton has a poor employment history—he had been fired from multiple jobs—and that this instability was another recidivism risk factor. By Gaines's account, Shelton's antisocial personality disorder has not diminished over time and indicates a predisposition to committing more sexually violent offenses. Gaines also stated that Shelton's persistent drug use is a risk factor for him to reoffend. Gaines expressed concerns that Shelton does not have a support system and that he does not see himself at risk to reoffend.

## B. Shelton Testified

The State called Shelton to testify at trial. He admitted that he had not been truthful in multiple depositions in the past year nor in multiple psychological evaluations. Shelton averred that he began to have problems with authority figures when he was young because his stepfather had abused him. Shelton recalled how he had been suspended from school at age nine and had later been expelled. He said that he began to use illegal substances around the age of twelve and that the first drug he used was heroine, that he had tried cocaine, but that his preferred drug of choice during his younger years was marijuana but later methamphetamine. He justified his two juvenile burglary adjudications by claiming he was attempting to retrieve his keys from his neighbors' house once and merely closing the window for his neighbor the second

7

time. Around the time he turned twenty, he was jailed for shoplifting, harassment, and criminal trespass; after he had sexually assaulted the fifteen year old in 2004, he was arrested for a myriad of offenses including criminal mischief, domestic assault, and retaliation.

Shelton described himself as a "recovering addict" and blamed illegal drugs for his past criminal history. Shelton said that when he used methamphetamine, it made him see women as "sex objects." He admitted that in the past, when being evaluated or deposed, he had claimed that he did not have a drug problem and was merely someone who chose to use them. Shelton testified that he would no longer have an issue with methamphetamine if he was released because he did not "plan on putting [himself] in that position to be tempted." Shelton said that in the past he had claimed that God had intervened and taken his desire for drugs away but admitted that after making such a claim he had written a friend that he had a craving for "dope."

According to Shelton, he has suffered from depression most of his life and has experienced anger issues. But Shelton claimed at trial that he had let go of his anger issues during a three-day retreat in 2017.

In discussing his 2004 sexual assault of the fifteen year old, Shelton claimed that he thought she was older than she was. Shelton denied that multiple people had warned him of how young the girl was prior to Shelton's having sexually assaulted her. He testified that it was "possible" that his sexual assault of the girl helped the girl's life turn

out better. Shelton stated that he purposely violated the conditions of his community supervision and was sent to prison.

Shelton admitted that after being released from prison, he "fell right back into" his old lifestyle and groomed and later sexually assaulted the fourteen year old in 2013. He also said that when he did sexually assault the girl, she was high on drugs. Contrary to Gaines's testimony, Shelton denied ever having sent messages to the girl suggesting that her mother would have to die in order for the two to be together, but he did admit that the girl had "vent[ed]" to him about wanting to kill her mother. By Shelton's account, he and the fourteen year old had discussed running away together. Shelton pleaded guilty to two counts of sexual assault and was assessed three years' incarceration for each count, with the sentences to run concurrently.

Regarding his daughter's outcry, Shelton denied ever inappropriately touching his daughter, instead claiming that her allegations of abuse stemmed from one incident where he intentionally tried to clean her genitalia and from another incident of "horse play[.]" He admitted, however, that after the allegations against his daughter came out, he wrote her from prison and said that if he was convicted of her allegations he would prefer to die than stay in prison. He also wrote his mother during the same time and said that Satan had put words in his daughter's mind.

Despite his denials, Shelton admitted at trial that he had once reported during therapy that he was "triggered" by seeing his daughter naked and by having seen her "vagina spread wide open." In a report of his "Sexual Abuse Offense Cycle On [his

9

daughter]," Shelton wrote about how he had groomed his daughter for the abuse and how he had manipulated the people around him so that he would have time alone with her. When the State questioned Shelton about the report, he admitted that he had written these things in the report but claimed that he had done so because his treatment provider had said that he needed to make himself look like a "monster." Shelton averred that he has never been sexually attracted to his daughter.

In 2017, while still incarcerated, Shelton pleaded guilty to indecency with a child by contact and aggravated sexual assault of his daughter, and he received concurrent five-year sentences. The judgments reflect that Shelton received more than two years credit for time served—time that Shelton would have been in prison due to his sexual assaults of the fourteen year old. At trial, Shelton also agreed that Child Protective Services had briefly investigated him previously for sexually abusing his daughter and stepdaughter, but Shelton alleged he could not remember what the exact complaint was. Shelton also confirmed that the daughter of his girlfriend had recently made sexual-assault allegations against him.

Although Shelton agreed that he would benefit from general therapy if he were released, he again averred that he no longer struggled with controlling his sexual desires. He further stated that he felt that children would be safe around him, but he would not feel safe being alone with a child for fear of false accusations against him.

## C. Dr. Darrel Turner Testified

Clinical and forensic psychologist Dr. Darrel Turner testified for the State. Turner testified that he was not the initial psychologist to evaluate Shelton regarding his psychological conditions; rather, he was assigned to assess Shelton after the State dismissed its initial Chapter 841 case, plea-bargained with Shelton, and then re-instituted these proceedings. Although he determines in 65 to 75% of commitment assessments that the subject does not have a behavioral abnormality, Turner said that in this case Shelton does.

Like Gaines, Turner testified that he examined a packet of information regarding Shelton before personally assessing him. Specifically, Turner said that he reviewed details of Shelton's offenses, "witness statements, police reports, any statements [ ] made by [Shelton] at that time [of the offenses], court documents, official documents, . . . information about his adjustment since he's been incarcerated in this case," and emails and letters Shelton wrote. Turner defined a behavioral abnormality as "something that prevents that person from being able to control their behavior as it relates to sexual drive, deviant sexual interest[,] and victimizing other people."

Turner said that he evaluated Shelton twice. The first time he evaluated Shelton was brief because Shelton exercised his right not to participate in the evaluation. The second interview lasted close to two-and-a-half hours. Turner explained the risk factors that he utilized in diagnosing Shelton. Turner said that the "two risk factors that correlate most with sexual recidivism are the presence of antisocial personality

11

characteristics and behaviors and sexually deviate interests that would require victimization in order to satisfy" and that Shelton displayed both of these risk factors as well as others. Turner described Shelton as currently being sexually deviant (as opposed to a past condition), and he stated that Shelton's condition was "chronic." Much like Gaines had done, Turner chronicled Shelton's criminal convictions for offenses against young and prepubescent girls. He also discussed other accusations that did not lead to criminal convictions and explained that those accusations were important for a proper evaluation of Shelton.

Regarding Shelton's conviction for sexual assault of the fifteen year old, Turner said that in addition to the two charges that Shelton was convicted of (intercourse with and performing oral sex upon the complainant), the complainant described sexual experiences with Shelton that "occurred multiple times over several months." Turner said that Shelton's conduct with the girl was considered sexually deviant because she was unable to consent to the acts and because the record indicates that Shelton knew at the time of the assaults how old the girl was even though he made statements to the contrary during the police investigation. Turner said that it was also significant that Shelton utilized marijuana and methamphetamine as part of his "grooming" of the complainant. Turner also stated that Shelton's belief that the sexual acts with the girl were "consensual" was indicative of his sexual deviance—in fact, according to Turner, Shelton referred to all of his victims as either "willing" or "consensual" victims. Turner

opined that when a person perceives a child as consenting to sexual acts, that too is indicative of sexual deviance.

Turner interpreted Shelton's testimony that his assaults may have helped one of his victims as his failure to appreciate the gravity of the harm he had committed against his victims; this was another factor that weighed toward Turner's recidivism assessment. Turner also thought it significant that Shelton emotionally described abuses he suffered as a child, but "that level of emotion [was] not there when he[ talked] about his own victims."

Turner expressed skepticism of Shelton's explanations for violating community-supervision conditions because Shelton's explanations had changed several times over the years. Turner averred that Shelton initially denied allegations that he was around children prior to revocation. Turner said that Shelton's community-supervision violations demonstrated a lack of self-control even in a supervised environment and that this was a risk factor regarding Shelton's behavior abnormality.

According to Turner, Shelton through the years had repeatedly denied assaulting the fourteen year old and admitted his culpability only after his daughter's allegations came out. In the past, by Turner's account, Shelton "denigrated" the fourteen-year-old victim by claiming that she was "wild," that she was already sexually active when he assaulted her, and that she would "dress provocatively." Turner interpreted these statements and beliefs as showing Shelton's lack of remorse and empathy for his victims. Turner also said that Shelton had begun to sexually groom the fourteen year

old when she was thirteen, including kissing and hugging her and that the offenses that Shelton pleaded guilty to occurred the day after the girl turned fourteen. Turner characterized Shelton's claim that he did not become sexually attracted to the girl until the day after she turned fourteen as simply not credible. He considered Shelton's having reoffended so soon after being released from prison for his earlier offenses (and while on community supervision) as heightening his recidivism risk.

Turner agreed with multiple treatment providers that had assessed Shelton as lacking insight into himself and not understanding the reasons for his abnormal behaviors. By Turner's account, Shelton is extremely antisocial and has learned "what to say in" treatment to sound as though he was making progress, but "actually there's very little progress, if any, going on." He also said that Shelton used religion as a way to manipulate those around him. Turner testified that Shelton's choice of victims—young girls that have familial problems, use drugs, and are sexually active at an early age—demonstrates that he chose his victims because he knew how to manipulate them and capitalize on their feelings of rejection. And according to Turner, Shelton's "pool" of victims is increasing because the age of his victims began with postpubescent girls and moved toward younger, prepubescent girls and because his victims had moved from nonfamily members to his own daughter. Turner also said that it was concerning that Shelton emotionally identified with his victims.

Shelton told Turner that he had pleaded guilty to the charges against his daughter only because it would allow him to complete his sexual-offender program. Turner said

that this explanation and the ones for his conduct against his daughter that he testified about indicated that he was likely to reoffend. Turner further elaborated on Shelton's abuse of his daughter, specifically pointing out that he was not supposed to be alone with her when the abuse occurred, that his daughter was roughly nine years old when the assaults began, and that Shelton had groomed his daughter by a "constant accidental touching," including touching her buttocks and breasts and by lifting up her shirt or pulling down her pants. Turner said that his daughter also reported that Shelton told her that the sexual contact was a "secret," that the contact was normal between a father and daughter, and that the reason he had gone to prison the first time was because the girl was not his biological child.

Turner explained that even though Shelton pleaded guilty to touching his daughter's breast and inserting his finger in her genitalia, the daughter's accusations contained details that Shelton had inserted his penis in his daughter's vagina, that the daughter had told Shelton that he was hurting her, but that Shelton did not stop because "he said he wasn't finished yet," and he only stopped because someone else came home. Turner further said that he did not believe Shelton's testimony that what he had reported in his sexual-cycle report for therapy was false because what Shelton had written corroborated his daughter's report.

Turner averred that his ultimate diagnosis regarding a behavioral abnormality was that Shelton suffers from pedophilic disorder of a nonexclusive type because in addition to prepubescent girls, Shelton is also attracted to adult women. Turner said

that he, unlike Gaines, had made the additional diagnosis of hebephilia, "which is a sexual attraction [to] children who have progressed through puberty." Turner admitted that hebephilia is not in the Diagnostic and Statistical Manual, Edition Five (DSM-V). Turner testified that Shelton's deviancy is "characterized by a sexual attraction to both prepubescent and postpubescent children." And Turner said that he believed that Shelton has substance-abuse issues and is likely to use illegal drugs again and that this was another factor which increases Shelton's recidivism risk.

Turner also diagnosed Shelton with antisocial personality disorder, which he said makes Shelton more likely to reoffend in the future. Moreover, Turner said that the combination of antisocial behavior and sexual deviancy "exponentially increased" Shelton's likelihood of reoffending. Turner testified that he had also tested Shelton with standard psychological exams and that Shelton tested as a thirty-one out of forty score as being a psychopath, falling within the range of individuals who display "a severely high degree of psychopathic traits," again increasing his tendency to reoffend. Shelton scored eight out of ten on another exam, which Turner said indicates a higher likelihood that Shelton will reoffend. Turner also tested Shelton for basic recidivism traits, which Turner said Shelton scored high on and indicated that Shelton was almost four times as likely to reoffend than "the average sex offender." Turner also expressed concern that Shelton had reoffended after his first stint in prison, and at that time he had a support system, including his mother, but now, according to Turner, Shelton has even less of a support system.

16

## D. Dr. John Tennison Testified

Shelton called forensic psychiatrist Dr. John Tennison to testify as an expert on his behalf, and, based on Tennison's two evaluations of Shelton and a review of the documentation, Tennison determined that Shelton does not have a behavioral abnormality. Tennison said that two factors lead him to his conclusions: (1) the data that he had reviewed "indicates that [] Shelton would not come anywhere near a threshold of fifty percent or more likely than not [to reoffend]," and (2) because Shelton was "able to disengage" having intercourse with his daughter when someone was approaching, demonstrating that Shelton "was in full control of his behavior." Tennison also believed that Shelton could control his behavior based on Shelton's use of a condom during his assault of the fourteen-year-old girl. And in Tennison's view, not all people who commit sexual crimes against children necessarily suffer from pedophilic disorder. Tennison admitted that if Shelton were to use methamphetamine, that would put him at a high risk of sexual recidivism, but Tennison claimed that this was not evidence of a behavior abnormality.

Tennison's review of Shelton's records revealed his diagnosis of bipolar disorder, but Tennison had not seen evidence of bipolar disorder in his albeit limited interactions with Shelton. Tennison did state that patients who suffer from bipolar disorder often also suffer from a "use disorder" like drug abuse. According to Tennison, many bipolar-disorder symptoms are often confused with those of antisocial personality disorder. Tennison disagreed with Turner's diagnosis that Shelton suffers from

17

antisocial personality disorder. Specifically, Tennison described a person suffering from antisocial personality disorder as unable "to conform themselves to the behavioral standards of . . . a rigid situation such as prison" and noted that Shelton's prison record had only one minor disciplinary mark.

Tennison stated that he did not believe that Shelton suffered from pedophilic disorder because his convictions demonstrate that he had only offended against one prepubescent victim—his daughter. Tennison also rejected the existence of hebephilia[3] and described it as an "attempt to pathologize attraction towards teenage females" and that "it's understood [by mainstream psychology] that it's biologically natural for a male to be attracted to teenage females" because teenagers are at "the height of fertility." But Tennison did acknowledge that it is wrong "when someone breaks a law and has sex with someone who is under the age of consent."

## E.  The Charge and the Verdict

After both the State and Shelton closed, and outside the presence of the jury, the State moved for a directed verdict on the first prong of a Chapter 841 case—that the State had shown as a matter of law that Shelton is a repeat sexually violent offender. The trial court granted the motion over Shelton's objection that "granting a directed verdict causes the jury to draw improper conclusions from the mere granting of the

---

[3]Tennison used the term ephebophilia, but it is evident from the record that Turner and Tennison were using the terms hebephilia and ephebophilia as synonyms.

18

directed verdict, causing them to lower the burden of proof for the State and causing them to hurry to an improper conclusion." After the trial court granted the directed verdict, it asked the State's attorney whether it had a proposed jury charge, and the State's attorney provided one. The trial court then addressed defense counsel and asked, "[O]ther than your objections to the directed verdict . . . did you have any other objections to their proposed charge?" Defense counsel responded that the jury charge should include a "10/2 instruction that a 'no' answer can be rendered by ten jurors as opposed to a mandatory twelve per a 'yes' verdict." Defense counsel did not otherwise make any other objection to the jury charge.

The trial court denied defense counsel's requested 10-2 instruction, and submitted only one question to the jury—whether Shelton is a sexually violent predator. The charge is titled "DIRECTED VERDICT JURY CHARGE" and later in the charge, under the heading of "DIRECTED VERDICT GRANTED BY THE COURT" the instructions read that "[t]he Court has granted a directed verdict that [Shelton] has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. Therefore, he is a 'repeat sexually violent offender' under (a)(1) and (b) above." After closing arguments, the jury retired to deliberate, and thirty-two minutes later, without having sent any notes to the court, the jury returned a unanimous verdict that Shelton is a sexually violent predator. Based on the jury's verdict, the trial court entered judgment that Shelton is a sexually violent

19

predator as defined by Chapter 841 and civilly committed Shelton for treatment and supervision upon his release from incarceration. This appeal followed.

## III. DISCUSSION

### A. No Fundamental Error

In his first issue, Shelton argues that "fundamental error" occurred in this case when the State "use[d] this civil case to perform the function of the criminal justice system after the State's 'improvident plea bargain' in a related criminal case." Shelton's argument is predicated on Justice Kennedy's concurring opinion in the Supreme Court of the United States decision in *Kansas v. Hendricks*. 521 U.S. 346, 371, 117 S. Ct. 2072, 2087 (1997) (Kennedy, J., concurring). In *Hendricks*, the Court held that the Kansas Sexually Violent Predator Act did not violate substantive due process, double jeopardy principles, or the prohibition of ex post facto laws. *Id.* at 370, 117 S. Ct. at 2086. The Court also held that the Kansas act was civil, not criminal, in nature. *Id.* at 370, 117 S. Ct. at 2086. Justice Kennedy joined the five-member majority but wrote separately to express concern regarding the potential "dangers inherent when a civil confinement law is used in conjunction with the criminal process . . . ." *Id.* at 371–72, 117 S. Ct. at 2087. Specifically, Justice Kennedy stated that "[i]f the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function." *Id.* at 373, 117 S. Ct. at 2087.

20

Seizing on this language, Shelton argues that when the State dismissed its initial Chapter 841 petition, entered a plea agreement with Shelton that he would serve five years' confinement for the offenses against his daughter (instead of a potential life sentence had he gone to trial), and then re-filed its Chapter 841 petition, the State made the "improvident plea bargain" that Justice Kennedy warned could occur. Recognizing that he did not object on this ground in the trial court, Shelton argues that this conduct by the State constituted "fundamental error" and that he did not have to preserve the issue for appellate review.

The State argues that Shelton has failed to preserve this issue for our review because he did not object in the trial court below and that Shelton has failed to provide this court with an adequate record on which to decide his complaint. We agree with the State.

In civil appeals, the fundamental-error doctrine is a narrow and limited exception to the procedural rules requiring parties to preserve error regarding their appellate complaints. *See In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003). In light of the strong policy considerations favoring the preservation-of-error requirement, the Supreme Court of Texas has called the fundamental-error doctrine "a discredited doctrine." *See id.* At most, the fundamental-error doctrine applies in the following three situations: (1) when the record shows on its face that the court rendering the judgment lacked jurisdiction; (2) when the alleged error occurred in a juvenile delinquency case and falls within a category of error as to which preservation of error is not required; and (3) when

21

the error directly and adversely affects the interest of the public generally, as that interest is declared by a Texas statute or the Texas Constitution. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) (including the first and third categories); *B.L.D.*, 113 S.W.3d at 350–51 (including the first and second categories).

The alleged error in Shelton's first issue does not fall within any of these three categories. The alleged error would not deprive the trial court of jurisdiction; the alleged error did not occur in a juvenile delinquency case; and, even though the alleged error may affect Shelton's own private interests, the alleged error does not directly and adversely affect the interest of the public generally as that interest is declared by a Texas statute or the Texas Constitution. Shelton does not make an argument otherwise.

Instead, Shelton argues that this court should expand the fundamental-error doctrine by looking at the Texas Court of Criminal Appeals decision in *Marin v. State*, 851 S.W.2d 275, 278–79 (Tex. Crim. App. 1993), overruled on other grounds by *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997). In *Marin*, the Texas Court of Criminal Appeals identified three categories of rules or rights: (1) systemic (or absolute) requirements or rights; (2) waivable rights; and (3) forfeitable rights. *See Mendez v. State*, 138 S.W.3d 334, 340 (Tex. Crim. App. 2004).

A systemic right is "a law that a trial court has a duty to follow even if the parties wish otherwise." *Id.* at 340. Systemic rights include those that are statutorily or constitutionally mandated, or are otherwise not optional, waivable, or forfeitable by either party. *See Sanchez v. State*, 120 S.W.3d 359, 365–66 (Tex. Crim. App. 2003).

22

Waivable rights, on the other hand, are those a judge has an independent duty to implement absent an effective waiver by the defendant. *Mendez*, 138 S.W.3d at 341. It is well-established that waiver ordinarily requires voluntary "relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938). Finally, forfeitable rights are rights which are implemented at the request of the defendant. *Mendez*, 138 S.W.3d at 341. The *Marin* Court reasoned that the general requirement for preservation of error as set forth in Rule 33.1(a) of the Texas Rules of Appellate Procedure does not apply to a violation of systemic or waivable rules or rights, and a violation of those rules or rights may be raised for the first time on appeal. *See id.*

Utilizing language from *Proenza v. State*, Shelton "contends that it threatens the integrity of the criminal adjudicatory process itself for the State to float in and out of this [Chapter 841] process and then unconstitutionally pursue this civil action to impose what amounts to criminal punishment which should be considered to be at least a [waivable] category-two *Marin* error if not a 'systemic' category-one *Marin* error." *See* 541 S.W.3d 786, 790 (Tex. Crim. App. 2017). Shelton's reliance on *Proenza*, however, is misplaced.

The *Proenza* court addressed the issue of whether an appellant could bring a claim for the first time on appeal that the trial court had violated Texas Code of Criminal Procedure Article 38.05, the statute that forbids a judge from discussing or commenting upon the weight of the evidence or making any remark calculated to convey to the jury

23

the judge's opinion of the case. *Id.* at 791. The *Proenza* court held that "claims of improper judicial comments raised under Article 38.05 are not within *Marin's* third class of forfeitable rights" and could be raised on appeal for the first time. *Id.* at 801. In reaching this holding, the *Proenza* court reasoned that because Article 38.05 is written in mandatory terms, it created a duty on the trial court to refrain from certain kinds of acts and thus Article 38.05 could not be a law that is forfeitable by a party's inaction. *Id.*

Other than summarily arguing that his issue should be considered "at least a [waivable] category-two *Marin* error if not a 'systemic' category-one *Marin* error," Shelton does not point this court to "a law that a trial court has a duty to follow even if the parties wish otherwise" or to a right that a judge has an independent duty to implement absent an effective waiver by the defendant. *Mendez,* 138 S.W.3d at 340. Thus, we conclude that Shelton has failed to demonstrate how this issue is not a typical, forfeitable, category-three *Marin* right. Accordingly, we reject Shelton's invitation to expand the "discredited" fundamental-error doctrine to include the issue he now brings on appeal, and we hold that Shelton has failed to preserve this issue for our review.

Relying on the Supreme Court of Kansas case of *In re Crane,* Shelton argues that the State's conduct in this case falls squarely within "the scene sketched by Justice Kennedy" in *Hendricks.* 269 Kan. 578, 589 (2000) (citing *Hendricks,* 521 U.S. at 371, 117 S. Ct. at 2072). But what makes Shelton's case distinct from Crane's is that in *Crane* the Supreme Court of Kansas had a fully developed record before it. Indeed, the record in

24

*Crane* demonstrated that Crane's victim had testified at Crane's sexual predator trial "that the State told her of its intention to follow Crane's plea with a sexual predator petition in order to prolong his confinement." *Id.* Despite this evidence, the *Crane* court did not find error on this ground.[4] *Id.*

But in this case the record is devoid of any evidence as to why the State proceeded in the manner that it did.[5] This lack of record is precisely why Shelton should have objected in the trial court and developed the record for appeal, and this is an independent reason why this court should decline to address his issue. *See Mason v. Our Lady Star of Sea Catholic Church*, 154 S.W.3d 816, 821 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The only type of fundamental error that might on occasion be raised without the benefit of a reporter's record is a jurisdictional defect apparent on the face of the record."). We overrule Shelton's first issue.[6]

---

[4]Rather, the *Crane* court reversed for failure of the trial court to instruct the jury "to make a finding as to Crane's inability to control his behavior." *Id.* at 586.

[5]Shelton spends the majority of his first issue claiming that the State's procedure of having filed a commitment petition, but then later dismissing it, entering a plea with Shelton on new charges, and refiling of the petition constitutes the issue that Justice Kennedy pointed out in his concurrence. *Hendricks*, 521 U.S. at 371, 117 S. Ct. at 2072 (Kennedy, J., concurring). But Justice Kennedy's concurrence did not address the exact circumstances that occurred in this case. Indeed, Justice Kennedy's hypothetical did not involve commitment proceedings that had already begun that were interrupted by both a new set of convictions and multiple allegations of sexual assault of children like occurred in this case.

[6]The State also argues that Shelton in effect is claiming prosecutorial misconduct and that under case law, Shelton was required to both object and develop a record for

## B. Closing Arguments

In his second issue, Shelton argues that the trial court erroneously prevented him from fully presenting "defensive theories." We disagree.

During closing arguments, the following exchange occurred:

[Shelton's Attorney]: Dr. Gaines found antisocial personality disorder, pedophilia. Dr. Turner found an additional one of ephebophilia which, of course, doesn't exist in any book that I've ever seen.

[State's Attorney]: Objection, Your Honor, improper argument. It's not in evidence.

THE COURT: Sustained.

[Shelton's Attorney]: Dr. Turner sat in here in trial and told you it doesn't exist in the DSM. It doesn't exist. There's no agreed upon criteria. There's no consensus. There's no general community standard regarding ephebophilia. But he gave it to him anyway, and then he came back and said, well, you know what, no, no, no, I specified paraphilia. And he made an interesting statement. Isn't better explained by something else. It isn't better explained by something else. Think about that for a minute.

---

appeal in order to preserve this issue for our review. To the extent he is bringing a prosecutorial-misconduct claim, the State is correct that he has failed to preserve such an issue for our review by not objecting on these grounds in the trial court. *See Joyner v. State*, 548 S.W.3d 731, 739 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) ("We have held that a claim of prosecutorial misconduct may be forfeited if not raised below."); *see also Real Prop. Located at 404 Fuller St., Kerrville, Kerr County, Texas v. State*, No. 04-17-00676-CV, 2018 WL 6624901, at *4 (Tex. App.—San Antonio Dec. 19, 2018, pet. dism'd w.o.j.) (mem. op.) (questioning the applicability of a prosecutorial-misconduct claim in a civil forfeiture proceeding and concluding that even if such a claim applied, a party still must make a specific and timely objection to preserve the issue for appeal).

Shelton's argument is that because the trial court sustained the State's objection, he was not afforded the right to call into question what he refers to as Turner's "bogus diagnosis" of hebephilia.

Rule 269 provides that arguments on questions of law shall be addressed to the court. Tex. R. Civ. P. 269(d). Arguments on the facts should be addressed to the jury, and counsel is required to confine the argument strictly to the evidence and to the arguments of opposing counsel. *Id.* at (e); *see Texas Sand Co. v. Shield*, 381 S.W.2d 48, 58 (Tex. 1964). The duty rests with the trial court to supervise and properly limit the scope of counsel's argument. *See City of Dallas v. Andrews*, 149 Tex. 609, 610, 236 S.W.2d 609, 611 (1951). Thus, a reviewing court will not interfere with the trial court's duty unless it is clear that the trial court abused its discretion. *In re Guardianship of Dahl*, 590 S.W.2d 191, 199 (Tex. App.—Amarillo 1979, writ ref'd n.r.e.); *see In re C.J.B.*, 137 S.W.3d 814, 826 (Tex. App.—Waco 2004, no pet.).

Here, as can be seen from the exchange above, what State's counsel was objecting to was defense counsel's statement that the diagnosis of ephebophilia "doesn't exist in any book that I've ever seen." Even though Shelton contends that this argument was proper because it was based "in evidence," neither party put on evidence that defense counsel had read any books, much less books that might contain psychological diagnoses. Indeed, as the State points out, defense counsel immediately proceeded to explain that Turner had testified that hebephilia was not in the DSM-V and that there is no medical-community standard or agreed-upon criteria or consensus

27

regarding hebephilia. The only thing that the trial court's ruling prevented was defense counsel claiming that hebephilia was not in any book defense counsel had ever seen. We conclude that the trial court was within its discretion to sustain the State's objection, and we overrule Shelton's second issue.

## C. The Directed Verdict

In his third issue, Shelton argues that the trial court erred by granting a partial directed verdict on the repeat-sexually-violent-offender element of the State's case. We disagree.

Although a defendant has an absolute right to a jury trial in sexually-violent-predator civil-commitment cases, *see* Tex. Health & Safety Code Ann. § 841.061(b), this court and several of our sister courts have consistently held that when there is undisputed evidence establishing that the defendant has been convicted of more than one sexually violent offense and a sentence was imposed for one of them, a person's status as a sexually violent offender is a legal determination appropriate for partial directed verdict. *See In re Commitment of Perdue*, 530 S.W.3d 750, 754 (Tex. App.—Fort Worth 2017, pet. denied) (holding trial court did not err by granting directed verdict on repeat-sexually-violent-offender element); *see also In re Commitment of Talley*, 522 S.W.3d 742, 750–51 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (same); *In re Commitment of Harris*, 541 S.W.3d 322, 330 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (same); *In re Commitment of Decker*, No. 11-17-00007-CV, 2017 WL 2869847, at *3–4 (Tex. App.—Eastland June 30, 2017, no pet.) (mem. op.) (same); *In re Commitment of Black*,

28

522 S.W.3d 2, 6 (Tex. App.—San Antonio 2017, pet. denied) (same); *In re Commitment of Lemmons*, No. 09-13-00346-CV, 2014 WL 1400671, at \*3 (Tex. App.—Beaumont Apr. 10, 2014, pet. denied) (mem. op.) (same).

Here, the State introduced pen packets demonstrating that Shelton had previously been convicted of six sexually violent offenses, all of which were accompanied by a sentence of imprisonment. And Shelton himself testified that he had been convicted of these offenses and served time for each of them. The trial court accordingly took judicial notice that Shelton had been convicted of the six offenses and served time. Shelton did not put on any evidence at trial to contradict these facts. Thus, the trial court did not err by granting the directed verdict. *See Perdue*, 530 S.W.3d at 754. We overrule Shelton's third issue.[7]

## D. Shelton's Requested Jury Instruction

In his fourth issue, Shelton argues that the "trial court erred to refuse [] Shelton's requested charge that the jury could render a verdict in his favor by a 10-2 vote in

---

[7]As recited above, although Shelton objected to the trial court granting the directed verdict, he did not object to the jury charge twice containing the language that the charge was a "DIRECTED VERDICT" charge. And he does not challenge the charge on appeal. However, such language should not be part of the charge because it is tantamount to a trial court's comment on the weight of the evidence. *See Redwine v. AAA Life Ins. Co.*, 852 S.W.2d 10, 14 (Tex. App.—Dallas 1993, no writ) (finding jury instructions constituted comments on weight of evidence); *see also* 34 Nancy Saint-Paul, *Texas Practice Series: The Jury Charge in Texas Civil Litigation* § 3.22 (2019 ed.) ("[t]he instructions in the jury charge ordinarily may not advise the jury that a fact issue has been conclusively established as a matter of law since that instruction might unduly influence the jury's answers about the other facts in the case").

accordance with Rule 292(a) of the Texas Rules of Civil Procedure." We agree that the trial court erred by not including an instruction that the jury did not need to unanimously agree in order to acquit Shelton, but we conclude that Shelton was not harmed by this error.

This court has already held that in a Chapter 841 proceeding, "the rules of civil procedure apply and such a determination only requires the agreement of 10 jurors," and it is error for the trial court to fail to include this instruction in its charge. *In re Commitment of Jones*, 571 S.W.3d 880, 890 (Tex. App.—Fort Worth 2019, pet. filed); *see also* Tex. Health & Safety Code Ann. § 841.146(b) ("Except as otherwise provided by this subsection, a civil commitment proceeding is subject to the rules of procedure and appeal for civil cases."); Tex. R. Civ. Proc. 292(a) (stating that "a verdict may be rendered in any cause by the concurrence . . . of the same ten or more members of an original jury of twelve"). Thus, as we held in *Jones*, the trial court in this case erred by not including the requested instruction. 571 S.W.3d at 890. But our inquiry does not end there.

Having found error, we must determine harm. To obtain a reversal of a judgment on the basis of trial-court error in civil cases, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). Charge error is generally considered harmful if it relates to a "contested, critical issue." *Transcon.*

30

*Ins. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010) (*quoting Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)). Unless the appellate court is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it, the error is reversible. *Romero*, 166 S.W.3d at 227–28.

In *Jones*, this court held that the trial court's failure to include an instruction to the jury that it could render a "no" finding with ten juror's concurrence was harmful error. 571 S.W.3d at 889–90. But the facts of *Jones* are distinguishable from the facts of this case, and a different outcome is warranted.

In *Jones*, this court determined that there was harm because even though the record did not demonstrate exactly how the vote among the jurors was split during deliberations, the record revealed a split definitely existed. *Id.* at 891. Indeed, in *Jones*, the jury issued four notes concerning the substance of the case: three requested portions of the record to review testimony of definitions of certain terms and one, issued four-and-a-half hours after jury deliberations began, declared that the jury was deadlocked. *Id.* About an hour and fifteen minutes after the trial court delivered a modified *Allen* charge urging the jury to continue deliberating, the jury returned a unanimous verdict. *Id.* This court held that given that record, we could not be reasonably certain that the verdict was not significantly influenced by the trial court's error. *Id.*

Unlike in *Jones*, the jury in this case did not issue any notes and delivered its unanimous verdict in thirty-two minutes. In short, there is nothing in this record, and Shelton has pointed to nothing, indicating that the jury was split in its decision. Thus,

31

considering the record as a whole in this case, we are reasonably certain that the verdict was not significantly influenced by the trial court's error.[8] *See id.*; *see also In re Commitment of Renshaw*, No. 06-19-00069-CV, 2020 WL 559292, at *11 (Tex. App.—Texarkana Feb. 5, 2020, no pet. h.) ("Unlike in *Jones*, there was no evidence of a split decision. Instead, the jury's only correspondence with the trial court said that it had reached a unanimous verdict.").

While admitting that there is no Texas authority to support his position, Shelton argues that under the guidance of the Supreme Court of New Jersey decision in *State v. Brown*, this court should presume harm in this case because "the jury in this case could have harbored a reasonable doubt whether [Shelton] is just a 'typical' or 'average' (and not an 'extremely dangerous' or 'worst of the worst') sex offender." 138 N.J. 481, 509 (1994). We conclude that Shelton's reliance on *Brown* is misguided for three reasons.

First, this court is not bound by the decisions of the Supreme Court of New Jersey. Second, *Brown* involves a criminal case that necessarily has two phases to it: a guilt-innocence phase and a punishment phase. *Id.* Shelton's case is a civil proceeding and thus, unlike in *Brown*, there is only one charge to the jury. The history of *Brown*

---

[8]When addressing harm in this context, our sister court in Beaumont analyzes the harm based on the evidence supporting a verdict that the defendant is a sexually violent predator. *See In re Commitment of Perez*, No. 09-15-00126-CV, 2015 WL 8470522, at *7 (Tex. App.—Beaumont Dec. 10, 2015, no pet.) (mem. op.). But this court in *Jones* looked to evidence in the record of whether the jury was split on its verdict, and we have done the same in this case. 571 S.W.3d at 890.

demonstrates the important differences between criminal and civil proceedings. Indeed, the Supreme Court of New Jersey overruled *Brown* in *State v. Cooper* to the extent that *Brown* suggested that the nonunanimous instruction was required during the guilt-innocence phase of trial (the beyond-a-reasonable-doubt phase), concluding that such an instruction was only required during the punishment phase. 151 N.J. 326, 331 (1997). Third, *Brown* simply does not stand for the proposition that the failure to include a 10-2 nonunanimous, acquittal instruction in the charge in a civil-commitment case is per se harmful error. 138 N.J. at 509. As we explained above, we have examined the record as a whole in this case and concluded that there is no evidence that the lack of this instruction probably caused the rendition of an improper judgment. Because we are not bound by cases from the Supreme Court of New Jersey, and because this case is distinguishable from *Brown* for the reasons discussed above, we decline to apply *Brown* in the manner which Shelton has asked.

## IV. CONCLUSION

Having overruled Shelton's first three issues and having concluded that the error Shelton presents in his fourth issue was harmless, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: April 16, 2020

33